United States District Court
Southern District of Texas

**ENTERED**

April 20, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EARTHA JEAN JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:14-cv-00646 |
| | § | |
| UNITED AIRLINES, INC. | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry No. 53). Plaintiff Eartha Jean Johnson has sued Defendant United Airlines, Inc., for breach of contract and promissory estoppel. (Second Amended, Supplemental and Superseding Complaint ["Complaint"], Docket Entry No. 73, at 8-13). Before the court is Defendant's motion for summary judgment. (Defendant United Airlines, Inc.'s Motion for Summary Judgment ["Motion"], Docket Entry No. 75). Responses and replies have been filed as well. (Memorandum in Opposition to United Airlines' Motion for Summary Judgment ["Response"], Docket Entry No. 86; Defendant United Airlines, Inc.'s Reply in Support of its Motion for Summary Judgment ["Reply"], Docket Entry No. 97; Supplemental Memorandum on Issues Raised During Oral Argument on United's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment ["Surreply"], Docket Entry No. 108). After considering the pleadings, the evidence submitted, the applicable law, and the arguments of counsel, it is RECOMMENDED that Defendant's motion be GRANTED.

## I. Background

*Continental's OnePass Program*

Prior to merging with United Airlines in 2010, Continental Airlines operated a frequent flyer program called "OnePass." (Mot. 3, Ex. B ["Suri Declaration"] at ¶ 7; *see* Compl. ¶¶ 8, 16; United Airlines, Inc.'s Original Answer to Plaintiff's Second, Supplemental and Superseding Complaint ["Answer"], Docket Entry No. 78, at ¶¶ 8, 16). Continental customers who were enrolled in that program received various designated benefits in exchange for their loyalty in travelling with the airline. (Mot. 3; *see* Mot. Ex. A-2 at United_EJJ_000011). Those benefits included free flights and seat upgrades. The OnePass program designations detailed several status levels that offered additional benefits beyond those available to general OnePass members. (Mot. Ex. A-1 at United_EJJ_000314-16, Ex. A-2 at United_EJJ_000007-09, Ex. A-3 at United_EJJ_000051-52, Ex. A-4 at United_EJJ_000017-21, Ex. A-5 at United_EJJ_000023-27, Ex. A-6 at United_EJJ_000034-37, Ex. A-7 at United_EJJ_000044-47). Continental provided these "elite" benefits on an annual basis based upon the number of air miles accrued by a OnePass member on company flights in the preceding year. (Mot. Ex. A-1 at United_EJJ_000316, Ex. A-2 at United_EJJ_000010, Ex. A-3 at United_EJJ_000054, Ex. A-4 at United_EJJ_000020, Ex. A-5 at United_EJJ_000028, Ex. A-6 at United_EJJ_000037, Ex. A-7 at United_EJJ_000047).

Until 1999, the "highest elite tier" in the OnePass program was "Gold Elite" status. (Resp. Ex. B). To qualify for "Gold Elite" status in a given year, a OnePass member must have flown at least 60,000 miles on Continental in the previous year.[1] (*Id.*). Then, in 1987, Continental introduced "Infinite Elite," a limited promotional offer of lifetime "elite" status for

---

1. From 1987 until 1989, the annual qualification for "Gold Elite" status was 70,000 miles. (Mot. Ex. A-2 at United_EJJ_000010).

those OnePass members who had achieved "Gold Elite" status for the past five consecutive years. (Resp. Ex. A). The "Infinite Elite" promotion was "discontinued" on December 31, 1997. (*Id.*). In 1997, Continental then reorganized the previous OnePass status levels into three distinct tiers: "Silver Elite," "Gold Elite," and "Platinum Elite." (Resp. Ex. B). At that time, the "Platinum Elite" level was designated as the "highest elite tier." (Resp. Ex. B, Ex. C). An internal memorandum stated that OnePass members with "Infinite Elite" status were given the new designation "Platinum for life." (Resp. Ex. B; *see* Resp. Ex. C ("With the introduction of our new Platinum Elite level, Infinite Elite members will receive Platinum Elite benefits.")).

It is uncontroverted that all benefits and rewards that were available to OnePass members, including "Infinite Elite" status, were subject to Continental's express right to change, or to terminate, at any time, any aspect of its frequent flyer program. (*See* Mot. Ex. A-1 at United_EJJ_000321, Ex. A-2 at United_EJJ_000015, Ex. A-3 at United_EJJ_000055, Ex. A-4 at United_EJJ_000020, Ex. A-5 at United_EJJ_000029, Ex. A-6 at United_EJJ_000038). Continental provided notice of these terms in its annual OnePass Elite Member's Guide. For example, the 1993 OnePass Elite Member's Guide stated the following:

> Continental Airlines . . . reserve[s] the right to change any aspect of the OnePass program at any time with 60 days' notice to active members. This right includes, but is not limited to, changes in partner affiliation, rules for earning mileage credit and mileage redemption levels. However, rules for use of travel rewards, cities served, flight schedules, limited seating or space availability, restricted travel dates and specific features of promotional offers are subject to changes with or without notice[.] . . . Continental Airlines reserves the right to discontinue the OnePass program with six months' notice to members. This means that regardless of the amount you participate in the program, your right to accumulate mileage and claim rewards will be terminated six months after we give you notice.

(Mot. Ex. A-2 at United_EJJ_000015).  Later editions of the OnePass Elite Member's Guide contain essentially the same language.  (*See* Mot. Ex. A-3 at United_EJJ_000055, Ex. A-4 at United_EJJ_000020, Ex. A-5 at United_EJJ_000029, Ex. A-6 at United_EJJ_000038).

Plaintiff Eartha Johnson enrolled in OnePass at some point before 1994.  (Compl. ¶ 8; Mot. 3-4).  Over the next few years, she flew enough miles on the airline to receive "elite" benefits.  (*Id.*).  In late 1998, she was awarded "Infinite Elite" status, effective January 1, 1999. (Mot. 5; Resp. Ex. C, Ex. D).  Continental confirmed the award in an undated letter, which provided, in relevant part:

> Welcome to the privileges of Infinite Elite status.  As an Infinite Elite, you are among an exclusive group of customers who have proven their loyalty to Continental Airlines year after year.  As our way of saying thank you, we are pleased to reward you with lifetime Elite privileges.  With the introduction of our new Platinum Elite level, Infinite Elite members will receive Platinum Elite benefits. . . . [W]e look forward to extending the highest privileges of OnePass Elite to you in 1999.

(Resp. Ex. C).

But in 2009, Continental introduced yet another status designation, this one called "Presidential Platinum Elite."  (Suri Decl. ¶ 3; Resp. Ex. B, Ex. H, Ex. O).  "Presidential Platinum Elite" status was deemed a "higher" level of benefits than even the "Platinum Elite" level. (Suri Decl. ¶ 4; Resp. Ex. B, Ex. H).  However, because the "Presidential Platinum Elite" level was designated as a "revenue" tier, rather than an "elite" tier, OnePass members with "Infinite Elite" status were not automatically awarded this new status. (Suri Decl. ¶ 5; Resp. Ex. B, Ex. H).  Instead, they were required to "earn" it. (Resp. Ex. B, Ex. H).  It is undisputed that Johnson never earned, was never offered, and never received any benefits associated with the "Presidential Platinum Elite" status. (Suri Decl. ¶ 6).

*United's MileagePlus Program*

In 2010, Continental Airlines merged with United Airlines. (Compl. ¶ 16; Answer ¶ 16; *see* Resp. Ex. N). Following the merger, United announced that its own frequent flyer program, MileagePlus, would be the only rewards program for the merged entity. (Resp. Ex. M ["Suri Deposition"] at 55:23-56:12). Similar to the OnePass program, United's MileagePlus frequent flyer program allows enrolled customers to earn benefits when, among other things, they fly on United Airlines, or one of its partner airlines. (*See* Ex. B-1). MileagePlus members are eligible to qualify annually for one of several "premier" status levels, which provide these extra benefits. (Suri Decl. ¶ 8; *see* Surreply Ex. 8). The highest "premier" status level in the MileagePlus Program is "Premier 1K."

However, some preferred MileagePlus members are also eligible to qualify for membership in United's "Global Services" program. (Suri Dep. 139:3-140:15). Membership in the "Global Services" program is offered, by invitation only, to United's "highest revenue customers." (Resp. Ex. F, Ex. G at Interrog. No. 22; Suri Dep. 139:6-23, 234:13-19). United customers with "Global Services" status receive even greater benefits than those with "Premier 1K" status. (Resp. Ex. G at Request for Admission No. 17, Ex. K). Those benefits include a separate check-in counter lane, priority seating and boarding, exclusive lounges, dedicated agents, and complimentary ground transportation. (Resp. Ex. K; Suri Dep. 235:2-12).

Every customer who enrolls in the United Airlines MileagePlus Program agrees to be bound by the program rules. (Mot. Ex. B-1 at United_EJJ_000001). General Condition No. 1 of the MileagePlus Program Rules provides, in relevant part, that:

> Membership and benefits in the MileagePlus Program . . . are offered at the discretion of United Airlines[,] . . . and United has the right to terminate the Program . . . or to change the terms and conditions, rules, regulations, policies and procedures [], benefits, conditions of participation or mileage levels, in whole or

in part, at any time, with or without notice, even though changes may affect the value of the mileage or certificates already accumulated.

(*Id.*).

In late 2011, United invited all OnePass members to join the MileagePlus Program. (Suri Dep. 64:11-22; Resp. Ex. I). Those OnePass members who did so were awarded a number of miles in the United program, which was equivalent to the number of miles they had accumulated in the Continental program. (Suri Dep. 247:8-18; Resp. Ex. I). In addition, Continental OnePass members with "Infinite Elite" status were given "lifetime status at the Premier 1K level." (Resp. Ex. I). On December 31, 2011, United terminated the OnePass program entirely, including all benefits associated with "Infinite Elite" status. (Suri Decl. ¶ 7; Suri Dep. 63:1-12, 64:24-65:9).

Shortly after that, in early 2012, Plaintiff enrolled in the United MileagePlus Program. (Compl. ¶ 21; Suri Dep. 64:24-65:9). Upon her enrollment, she was immediately designated as a "Premier 1K member for life." (Resp. Ex. G at Request for Admission No. 16; *see* Resp. Ex. F). The following year, Johnson contacted United, by letter dated February 8, 2013, to inquire about her status. (Resp. Ex. L). In that letter, Johnson stated the following:

> I am writing concerning my 1K status. As you are likely aware, back in the 80's and 90's Continental had a program called Infinite Gold, at that time, Gold was its highest elite status. Continental represented to us that if we obtained Gold status for 5 years, we would always have its highest elite status. I obtained the Gold status and until now Continental has been true to its word. When Continental/United merged, however, I was classified as 1K status, when Global Services is in fact Continental/United['s] highest elite status. I am hereby requesting my designation to be reclassified to reflect the Global Services status which I am entitled [sic].

(*Id.*). Three weeks later, on March 1, 2013, United responded to Johnson, in relevant part, as follows:

> Thank you for your recent correspondence[.] . . . Please understand that the Global Services program, similar to Continental's Presidential Platinum program, is not a Premier tier but instead an annual invitation-only membership program

6

based in part on revenue contribution. Your account has been documented as a former OnePass Infinite Platinum Elite account, and in accordance with our promise of lifetime top-tier earned status, you will retain a Premier 1K member [sic] for life. However, I must respectfully decline your request for lifetime Global Services status.

(Resp. Ex. F).

*Procedural History*

On January 30, 2014, Plaintiff filed this action, in Texas state court, against United Airlines, claiming breach of contract and promissory estoppel. (Docket Entry No. 1 at Ex. C). The case was removed to federal court, on the basis of diversity jurisdiction. (Docket Entry No. 1 at ¶ 3). Following removal, United filed a motion to dismiss the Complaint, under Federal Rule of Civil Procedure 12(b)(6). (Docket Entry No. 3). The court granted that motion, and dismissed the case, on June 26, 2014. (Docket Entry No. 17; Docket Entry No. 18). On July 9, 2015, the United States Court of Appeals for the Fifth Circuit reversed that decision, and remanded the case with instructions to allow Plaintiff to amend her pleadings. (Docket Entry No. 27). Plaintiff subsequently amended her complaint on July 20, 2015, and again, on February 4, 2016. (Docket Entry No. 28; Docket Entry No. 73).

In the pending Second Amended Complaint, Johnson claims that she entered into a written contract with Continental Airlines for "lifetime Infinite Elite frequent flyer status." (Compl. ¶¶ 9, 12). She alleges that United "assumed and became responsible" for that contract, and eventually "ratified" it, when it merged with Continental in 2010. (*Id.* at ¶¶ 16, 28). Plaintiff claims that Defendant "breached its contractual obligations [by] . . . not award[ing] [her] . . . United's highest tier frequent flyer status, Global Services." (*Id.* at ¶ 30). In addition, she alleges that she "relied to her detriment upon United's representations that it would assume and honor Continental's contractual obligations," by "continuing as a member of [MileagePlus]," by

"continuing to fly upon United whenever possible," and by "choosing to not fly on other airlines." (*Id.* at ¶ 38).

United now moves for summary judgment. From a review of the pleadings, the evidence submitted, the applicable law, and the arguments of counsel, the court concludes that Defendant's motion should be granted.

## II. Standard of Review

Summary judgment is appropriate if the record discloses "that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (a). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party, however, need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (internal quotation marks omitted). If the moving party meets its initial burden, however, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). "[T]he nonmovant must identify specific evidence in the record and articulate how that evidence

supports that party's claim." *Id.* (quoting *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). However, the court is "not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions[,] which are either entirely unsupported[,] or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2008) (citing *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir. 2003)).

## III. Analysis

### A. Breach of Contract

Johnson alleges that United "assumed" and "ratified" Continental's "contractual obligations" to provide her with "lifetime highest tier frequent flyer status." (Compl. ¶¶ 16, 26, 28). She complains that Defendant then breached that agreement by "not award[ing]" her with "Global Services" frequent flyer status. (*Id.* at ¶ 30). United seeks summary judgment on this claim, arguing that Johnson has failed to produce any evidence to show a written offer for "lifetime highest tier frequent flyer status." (Mot. 16-20). In addition, Defendant contends that it did not breach any contract with Plaintiff, as a matter of law, because "the plain and unambiguous terms of both the Continental OnePass and the United MileagePlus programs allowed the airlines the unilateral right to change the qualifications for, and the benefits provided

by, their frequent flyer programs." (*Id.* at 10). Defendant also argues that, even if Plaintiff could establish a breach of contract, any claim for that wrongful conduct is barred by the statute of limitations. (*Id.* at 15-16).

"The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App.—Houston [1st Dist.] 2015, no pet. h.) (quoting *CCC Grp. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 196 (Tex. App.—Houston [1st Dist.] 2014, no pet.)). The elements of a valid contract are: "(1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Wilmot v. Bouknight*, 466 S.W.3d 219, 229 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quoting *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App—Houston [1st Dist.] 2008, no pet.)). "[A] unilateral contract is created when a promisor promises a benefit if a promisee performs." *City of Houston v. Williams*, 353 S.W.3d 128, 135-36 (quoting *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 303 (Tex. 2009)).

### 1. Existence of a valid contract

United argues, in its motion, that Plaintiff has failed to raise a fact issue on whether a valid contract exists for "lifetime highest tier frequent flyer status." (Mot. 16-21). Defendant is adamant that there is no evidence that Continental ever promised to provide Johnson with that particular benefit.[2] (*Id.* at 16). United does not dispute that Continental offered, and ultimately

---

2. Both parties devote significant portions of their supporting briefs to the issue of whether the statute of frauds applies to the offer relied upon by Johnson as the basis for her breach of contract claim. (*See* Mot. 18-19; Resp. 19-20). However, the court need not address that issue, as Johnson has never alleged that the offer was

awarded Johnson "Infinite Elite" status in its OnePass program. (*Id.* at 5). However, it contends that "[t]he unambiguous terms of [that offer] conveyed nothing more than recurring Gold Elite status without [the] need for requalification." (*Id.* at 18; *see* Mot. Ex. A-2 at United_EJJ_000010).

On the other hand, Johnson maintains that the contract at issue in this case is "clear and unambiguous," although its terms are apparently to be found in several different documents, which span almost twenty years. (Resp. 4, 19-20; Surreply 2-6). Plaintiff is explicit that Continental's "Infinite Elite" promotion, which is detailed in the 1993 OnePass Elite Member's Guide, was an express unilateral offer of "Continental's highest tier frequent flyer status for life." (Resp. 4; *see* Surreply 3). She states that she "fully accepted" that offer in 1998, "by completing the required flights," and that she then became immediately entitled to receive the "highest privileges" available in Continental's frequent flyer program. (Surreply 1, 4; *see* Resp. 4-5).

According to Plaintiff, "[a]t the time the Infinite Elite Promotion offer was made," in 1993, "Continental's OnePass awards program consisted of Bronze, Silver and Gold Elite statuses, where Gold was its highest status." (Resp. 5). Plaintiff insists that at the time that she earned "Infinite Elite" status, in 1998, she was designated as "Platinum Elite," rather than "Gold Elite," because "Platinum" had become the airline's "highest elite status." (*Id.* at 5-6). Johnson claims that "[t]his process of always moving [her] to the new 'highest' status" is evidence that she was promised Continental's "highest status and the attendant benefits of that status." (Surreply 2). In making that argument, Johnson emphasizes that she "has n[ever] been classified

---

unwritten. (*See* Compl. ¶ 9 (alleging that "Continental made the Infinite Elite Promotion offer to [] Johnson in written documents); Resp. 4 (stating that "[t]he agreement is confirmed in several documents")). Moreover, the Fifth Circuit has held that the March 1, 2013 letter from United, which references "our promise of lifetime top-tier earned status," completely "detaches the statute-of-frauds issue from this case." (Docket Entry No. 27 at 1-2; *see* Resp. Ex. F).

as Infinite Gold[,] since Gold became something less than the highest standard." (Resp. 5). In the alternative, Johnson argues that the terms of the "Infinite Elite" offer are "ambiguous" in regard to the nature of the benefits conferred, so that resolution of that ambiguity would be improper on a motion for summary judgment. (*Id.* at 16-17, 20).

Here, the parties disagree about the proper construction of the "Infinite Elite" offer. In Texas, contract construction is a matter of law. *Plains Exploration & Prod. Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (citing *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 7 (Tex. 2014)). A court's primary concern in construing a contract is to ascertain the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). In identifying such intent, the court "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* Further, "contract terms are given their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794-95 (Tex. 2012) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)) (internal quotation marks omitted).

"Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole, in light of the circumstances present when the contract was entered." *Union Pacific R.R. Co. v. Ameriton Props. Inc.*, 448 S.W.3d 671, 678 (Tex. App.—Houston [1st Dist.] 2014, no pet. h.) (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)). "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per

curiam).  "[A] contract is ambiguous only if, after applying the rules of construction, it remains 'subject to two or more reasonable interpretations.'"  *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 19 (Tex. 2015) (quoting *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998)).  "An ambiguity does not arise simply because the parties offer conflicting interpretations."  *RSUI*, 466 S.W.3d at 119 (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 57 (Tex. 2003)); *Plains Exploration*, 473 S.W.3d at 305 ("Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous.").

There can be no serious question that the 1993 OnePass Elite Member's Guide set out the complete terms of the "Infinite Elite" offer as follows: "If you've earned Gold Elite membership for five consecutive years, by flying the required amount of Elite miles, you'll achieve Infinite Elite—the ultimate Elite membership—and enjoy the rewards and privileges of Gold Elite status for life, with no annual requalification ever again!"  (Mot. Ex. A-2 at United_EJJ_000010).  The "Infinite Elite" benefit is further defined by the 1993 OnePass Elite Member's Guide as "[t]he ultimate benefit—lifetime Gold membership for those who have earned Gold Elite status for 5 consecutive years." (*Id.* at United_EJJ_000008).  None of the other terms of the "Infinite Elite" offer are defined, or referenced elsewhere in the guide.

Plaintiff argues here that the phrase "the ultimate Elite membership" confers a right to "Continental's highest tier frequent flyer status for life," because "ultimate" is "synonymous" with "highest."  (Resp. 4; Surreply 1).  Defendant, on the other hand, emphasizes that, by its plain terms, the "Infinite Elite" promotion was only an offer for "Gold Elite status for life without [the] need for yearly requalification." (Mot. 18).

Considering the Member's Guide at issue, as a whole, the "Infinite Elite" promotion is an unambiguous offer of lifetime Gold Elite status.  Indeed, the terms of the offer unequivocally

state that it is for "Gold Elite status for life." (Mot. Ex. A-2 at United_EJJ_000010). While Plaintiff maintains that the terms of the "Infinite Elite" promotion can be read to create an offer of "lifetime highest tier frequent flyer status," because of the word "ultimate," the "Infinite Elite" promotion does not mention "highest tier frequent flyer status," or "top-tier frequent flyer status." (Resp. 15-16; Surreply 1; *see* Mot. Ex. A-2 at United_EJJ_000010). Nor are those phrases found in other parts of the 1993 OnePass Elite Member's Guide. *See Nesmith v. Valley Baptist Med. Ctr.*, No. 13-15-00207-CV, 2016 WL 872668, at *4 (Tex. App.—Corpus Christi Feb. 18, 2016, no pet. h.) (finding a plaintiff's interpretation of a contract to require minimum compensation to be "unreasonable," because the contract did not mention minimum compensation at all). Further, Plaintiff's interpretation would "render meaningless" the designation of the phrase, "Gold Elite status for life." *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Her interpretation, therefore, is not reasonable. *See J.M. Davidson*, 128 S.W.3d at 229; *Heritage*, 939 S.W.2d at 121; *Nesmith*, 2016 WL 872668, at *4.

In further support of her contention that the offer was for the "highest tier frequent flyer status for life," Johnson relies on other extrinsic evidence, including her own affidavit; a 1998 letter from Continental; internal memoranda from United; excerpts from the United Inflight Services Guide; and the parties' course of dealings. (Docket Entry No. 86-1 ["Johnson Affidavit"]; Resp. Ex. C; Surreply 4-7, Ex. 3, 5, 7). However, the terms of the "Infinite Elite" offer are unambiguous. For that reason, Johnson may not introduce any extrinsic evidence to prove the contract terms. *See David J. Sacks*, 266 S.W.3d at 450; *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996).

In addition, some of the very evidence that Plaintiff relies on actually contradicts her

proposed interpretation of the "Infinite Elite" offer.  For instance, Plaintiff has submitted an undated internal memorandum from United, entitled "Recommend OP Infinite Elites continue at Premier Platinum for 2012," which includes the following timeline entry: "2009: Presidential Platinum Elite revenue tier introduced; [Continental] determined that Infinite Elites must earn this level and were not entitled to higher status." (Resp. Ex. B).  By her own admission, Johnson was never offered, and never received, the "Presidential Platinum Elite" status.[3]  (Resp. 18).

Finally, Plaintiff argues that the "Infinite Elite" offer should be construed to "fulfill [her] expectations," because the circumstances under which the agreement was entered created a "contract of adhesion." (Resp. 16-17).  Plaintiff insists that, because "Continental and United drafted the frequent flyer program rules and regulations," and because "Johnson was not given the opportunity to negotiate the terms and conditions of those frequent flyer programs," the resulting contract was one of adhesion, and its terms should be construed against the drafters. (Id.).  However, to prove a contract of adhesion, Johnson must show that "the forces of circumstance [were] so compelling that [her] free will was subverted to the point of its incapacity." Industria Fotografica Interamericana S.A. de C.V. v. M.V. Jalisco, 903 F. Supp. 18, 20 (S.D. Tex. 1995).  She has produced no such evidence in this case.  Further, the MileagePlus Program Rules unequivocally give United the "sole right to interpret and apply" the contract terms. (See Mot. Ex. B-1 at United_EJJ_000001).  As a result, that argument fails. See Han v. United Continental Holdings, Inc., 762 F.3d 598, 603 n.5 (7th Cir. 2014) ( rejecting a plaintiff's argument that the terms and conditions of the MileagePlus Program amounted to a contract of

---

3. In her Surreply, Plaintiff argues that "Presidential Platinum Elite" status was not, in fact, a "higher level of benefits" than "Infinite Elite," because "it required requalification every year based upon miles flown and spending $30,000 on Continental flights each year." (Surreply 10-11).  However, the uncontroverted summary judgment evidence shows that Continental deemed "Presidential Platinum Elite" status to be its "highest tier frequent flyer level of benefits." (Suri Decl ¶ 4).

adhesion, because, among other things, "the MileagePlus Program Rules unambiguously gave United deference to interpret the contract terms").

In this case, the "Infinite Elite" offer, which forms the basis of Plaintiff's breach of contract claim, unambiguously promised lifetime Gold Elite membership. As a result, Plaintiff cannot demonstrate the existence of a valid contract for "highest tier frequent flyer status for life." *See Wilmot*, 466 S.W.3d at 229. For that reason, summary judgment is warranted on Plaintiff's breach of contract claim. *See Schlumberger*, 472 S.W.3d at 892.

   *2. Breach*

   Even assuming, in an abundance of caution, that Johnson had established a valid contract for "lifetime highest tier frequent flyer status," she has not brought forward evidence to establish a breach of that agreement. In its Motion, Defendant argues that "the express terms of the [OnePass frequent flyer program] allowed Continental, and therefore United, to create new benefits levels such as Global Services, [to] define the criteria to obtain the new benefits, and to change or reduce any benefits that might have been historically available under the [] program." (Mot. 11-12). Defendant argues further that, after OnePass was terminated in 2011, Johnson lost any "right to demand the continued provision of any particular benefits that might have been previously available through any contract created by th[at] program." (*Id.* at 12). Defendant also points out that its "administration of the MileagePlus frequent flyer program would not, and did not, breach the terms of any contract formed when [] Johnson enrolled in and began participating in [] MileagePlus," because the MileagePlus Program Rules "expressly authorize United to change the program benefits at any time." (*Id.* at 13).

   Plaintiff, for her part, does not dispute that Continental and United each had the right to change, or to terminate, the benefits associated with their respective frequent flyer programs.

(*See* Resp. 14-15).   Johnson responds, however, that United "d[id] not have the right to unilaterally terminate [her] lifetime benefits," because "lifetime benefit[s] [are] by definition [] permanent, unchangeable, unambiguous thing[s]."   (Resp. 15).   Plaintiff also argues that her qualification for "Infinite Elite" status gave rise to a "separate contract," to which United's frequent flyer program rules do not apply.  (*Id.* at 14-15).

In this case, Plaintiff has produced no evidence to show that United breached the terms of Continental's OnePass program.   It is undisputed that the "Infinite Elite" benefit was a subordinate part of the OnePass program.  (Resp. 5, Ex. C, Ex. D).  As a part of the OnePass program, the "Infinite Elite" benefit was subject to "[a]ll OnePass terms and conditions unless otherwise stated."  (Mot. Ex. A-2 at United_EJJ_000015).  The OnePass terms and conditions expressly authorized Continental to "change any aspect of the OnePass program at any time with 60 days' notice to active members," and to "discontinue the OnePass program with six months' notice to members."  (*Id.*).  In accordance with those terms and conditions, the OnePass program was terminated on December 31, 2011.  (Suri Decl. ¶ 7; Suri Dep. 63:1-12, 64:24-65:9).

Plaintiff has also failed to raise a genuine issue of material fact on whether United violated the terms of its own frequent flyer program.  Johnson became a MileagePlus member in 2012.  (Compl. ¶ 21; Suri Dep. 64:24-65:9).  By enrolling in MileagePlus, Johnson agreed to be bound by the MileagePlus Program Rules.   (Mot. Ex. B-1 at United_EJJ_000001).   The MileagePlus Program Rules clearly give United "the right to terminate the [MileagePlus] Program and/or the Premier Program or to change the terms and conditions . . . in whole or in part, at any time, with or without notice."  (*Id.*).  All participation in MileagePlus is governed by the MileagePlus Program Rules, and "no covenants at law or in equity shall be implied or incorporated."  (*Id.*).   Moreover, "United has the sole right to interpret and apply the

[MileagePlus] Program Rules." (*Id.*).

Plaintiff argues, nevertheless, that she entered into a "separate contract" with United for "lifetime highest tier frequent flyer status," that was not governed by the MileagePlus Program Rules. (Resp. 14-15). In support of that contention, Plaintiff relies on a March 1, 2013 letter from United, in which the airline informs Johnson that, "in accordance with our promise of lifetime top-tier earned status, you will [be] a Premier 1K member for life." (Resp. 13-14, Ex. F). In addition, Plaintiff has produced an undated internal memo from United, which discloses that the airline considered "Infinite Elite" status to be "separate" from "Million-Mile Flyer" status. (Resp. 7, Ex. E). Plaintiff further relies on deposition testimony from a United representative, Nandika Suri, in which she testified that "Infinite Elite" status was "not equal" to lifetime "Premier 1K" status. (Resp. 7, Ex. M at 247:19-248:14). While this evidence suggests that United considered "Infinite Elite" status to be dissimilar from its own frequent flyer status levels, it does not show that Johnson had a contract for "lifetime highest tier frequent flyer status" that was "separate" from MileagePlus. Indeed, the March 1, 2013 letter relied upon by Johnson clearly shows that she was assigned a "premier" status level within the MileagePlus Program. (*See* Resp. Ex. C). Further, by Plaintiff's own admission, her "Infinite Elite" benefit became "part of the [] MileagePlus program." (Resp. 8).

On this record then, Johnson has failed to raise a genuine issue of material fact on whether United breached an agreement to provide her with lifetime "highest tier" frequent flyer benefits. *See Hammarquist v. United Continental Holdings, Inc.*, 809 F.3d 946, 949-51 (7th Cir. 2016) (finding that the plaintiffs, MileagePlus members who had achieved Premier status, had failed to show that their qualification for Premier status gave rise to an additional, independent contract for Premier benefits, because the evidence established that "the premier status levels of

18

the MileagePlus program were simply a subordinate part of that program whose benefits United could legitimately alter at any time"); *Lagen v. United Continental Holdings, Inc.*, 774 F.3d 1124, 1127 (7th Cir. 2014) ("Because Lagen cannot show that United made him an offer to enter into a contact separate from the arrangement governing MileagePlus, Lagen cannot show a breach of any such contract. Nor can he show a breach of the MileagePlus Program Rules, because they have always allowed United to tinker with all details of the program."). For that reason, as well, summary judgment should be granted on this claim. *See Schlumberger*, 472 S.W.3d at 892.

*B. Promissory Estoppel*

Johnson has also brought a claim for promissory estoppel, alleging that she "substantially relied to her detriment on Continental's promise to provide [her] with lifetime top-tier frequent flyer status by incurring costs and expenses to take many flights on Continental solely for the purpose of accumulating the required number of miles." (Compl. ¶ 34). She alleges that she "relied to her detriment upon United's representations that it would assume and honor Continental's contractual obligations[,] . . . by "continuing as a member of United's frequent flyer program," by "continuing to fly upon United whenever possible," and by "choosing to not fly on other airlines." (*Id.* at ¶ 38).

The elements of a promissory estoppel claim are: "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to h[er] detriment." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002); *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). Promissory estoppel is "defensive in nature and operate[s] to prevent the loss of existing rights." *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988); *see Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 (Tex. App.—Waco

2012, no pet.) ("Promissory estoppel is an equitable exception used to avoid a statute of frauds defense"). However, it cannot "create liability where it does not otherwise exist." *Hruska*, 747 S.W.2d at 785; *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937 (1972) (stating that promissory estoppel "does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them"); *see Pankow v. Colonial Life Ins. Co. of Tex.*, 932 S.W.2d 271, 276 (Tex. App.—Amarillo 1996, writ denied) ("One cannot estop a contract into existence."). In general, promissory estoppel may be used offensively, as an affirmative cause of action, only "[w]here the promisee has failed to bind the promisor to a legally sufficient contract, but where the promisee has acted in reliance upon a promise to his detriment." *Transcon. Realty Investors, Inc. v. John T. Lupton Trust*, 286 S.W.3d 635, 648 (Tex. App.—Dallas 2009, no pet.) (quoting *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965)).

In this case, Johnson attempts to invoke promissory estoppel to enforce an alleged promise by United for "lifetime top-tier frequent flyer status." (Compl. ¶ 39). However, because there is no evidence that Defendant made such a promise, there is no basis for a claim of promissory estoppel. *See Hruska*, 747 S.W.2d at 785; *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 761-62 (Tex. App.—Fort Worth 2012, pet. filed); *Pankow*, 932 S.W.2d at 276. Therefore, Defendant is entitled to summary judgment on that claim.

## IV. Evidentiary Objections

The exhibits attached to Plaintiff's response to the motion for summary judgment include her own affidavit, as well as an affidavit and a "preliminary expert report" from Ann Morales Olazabal. (Johnson Aff.; Docket Entry No. 86-2 ["Olazabal Affidavit"]). United asks that those opinions offered by Olazabal be excluded, under Federal Rules of Evidence 702 and 703,

arguing that she is "unqualified," and that her opinions are "unreliable." (Reply 11 n.6). United also objects to the affidavit from Johnson, contending that it is "self-serving" and "misleading." (*Id.* at 6). The court has not relied on any of those documents in reaching its conclusions, and for that reason, the evidentiary objections are moot.

## V. Conclusion

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 20th day of April, 2016.

MARY MILLOY
UNITED STATES MAGISTRATE JUDGE